## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| RICHARD HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-00502-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Richard Harris appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits. Doc. 1. Plaintiff Harris applied for supplemental security income (SSI) benefits with an alleged onset date of August 9, 2019. Doc. 10-6 at 2–11. The Commissioner denied Harris's claim for benefits. Doc. 10-3 at 16–30.

The parties consented to magistrate judge jurisdiction. Doc. 19; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73. After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

1

## ISSUES FOR REVIEW

In this appeal, Harris argues that the court should reverse and remand (1) because the Administrative Law Judge (ALJ) "failed to provide an articulate assessment" of the medical opinion of Dr. June Nichols, (2) because the ALJ "improperly dismissed the opinion of Counselor White, ALC-NCC," (3) because the ALJ "failed to develop the record" regarding Harris's irritable bowel syndrome (IBS), and (4) because substantial evidence did not support the ALJ's omission of bipolar disorder from the list of Harris's severe impairments.  Doc. 14 at 11, 20, 23, 26.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C.

§ 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:   (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily

3

shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's

4

decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.  Harris's personal and medical history

Harris was born on March 20, 1974. Doc. 10-3 at 41; Doc. 10-4 at 28.

In September 2011, Harris went to the Gadsden Regional Medical Center with complaints of suicidal ideation; he reported that he had not been taking his bipolar

medication.  Doc. 10-9 at 59–65.  Harris was transferred to a psychiatric facility.
Doc. 10-9 at 60, 63–64.  Harris was admitted to the Marshall Medical Center and
given medication including Prozac, Depakote, and Vistaril; he was discharged on
September 14, 2012.  Doc. 10-10 at 2–15, 36.

Harris was in prison from 2013 to 2017 and received medical care for mental
illness and back problems while incarcerated.  Doc. 10-7 at 12.

On February 26, 2018, Dr. Jon G. Rogers, Ph.D., filled out a psychological
consultative evaluation for Harris.  Doc. 10-9 at 9.  Dr. Rogers noted that Harris
reported receiving mental health treatment since the age of 18 and had been
hospitalized 5 times due to mental illness.  Doc. 10-9 at 19.  Dr. Rogers stated that
Harris reported that "treatment, therapy, and/or medication(s) have helped him 'very
well,'" and noted that Harris had not taken his medication on the day of the
evaluation.  Doc. 10-9 at 19.

Harris told Dr. Rogers that he was experiencing symptoms including
depressed mood, insomnia, easy fatiguability, difficulty sleeping, and difficulty
concentrating; Harris reported that he had attempted suicide three times, most
recently in 2012.  Doc. 10-9 at 19.  Harris reported that he had troubled and unstable
relationships.  Doc. 10-9 at 19.  In terms of physical symptoms, Harris reported
suffering from symptoms including diarrhea, headaches, insomnia, and pain in his
lower back and legs.  Doc. 10-9 at 20.

Dr. Rogers recounted Harris's personal history, including that Harris had previously had trouble keeping a job because he "couldn't get along with people." Doc. 10-9 at 20.  Harris reported that his daily activities consisted of getting up around 8:00 AM and going to bed around 11:00 PM, and "personal hygiene, watching TV, talking on the phone, housecleaning, laundry, and reading," as well as helping to wash clothes and dishes.  Doc. 10-9 at 20.  Harris reported to Dr. Rogers that he "has a few friends with whom he enjoys movies, talks on the phone, visits, plays cards, and goes camping."  Doc. 10-9 at 20.

Dr. Rogers included in his report that Harris arrived on time for his appointment with good appearance, dress, and grooming, a cooperative attitude, and an unremarkable physical appearance.  Doc. 10-9 at 21.  Harris had normal speech and conversation, but appeared anxious and reported that "most of the time he feels 'not too good.'"  Doc. 10-9 at 22.  Harris was not able to complete all of the tests that Dr. Rogers administered to assess concentration and attention, and showed poor judgment and insight, but completed tests for memory.  Doc. 10-9 at 22.

Dr. Rogers opined that Harris could function independently and had below average quality of daily activities.  Doc. 10-9 at 22.  Dr. Rogers' psychodiagnostic impression included diagnoses of depressive disorder, anxiety disorder, and pain.  Doc. 10-9 at 22.  Dr. Rogers found Harris to have moderate mental impairment and to be able to perform most activities of daily living.  Doc. 10-9 at 24.  Dr. Rogers

further opined that Harris's ability to understand, remember, and carry out instructions would be "mildly impaired," that his ability to respond appropriately to supervision and coworkers would be "moderately impaired," and that his ability to respond appropriately to workplace pressures would be "mildly impaired." Doc. 10-9 at 25.

On February 22, 2018, Harris had a disability examination with Nurse Shana White at the Scottsboro Quick Care Clinic. Doc. 10-9 at 69. White noted that Harris had been diagnosed with bipolar disorder many years ago. Doc. 10-9 at 69. Harris had no gastrointestinal complaints. Doc. 10-9 at 69. White noted that Harris presented with bipolar disorder and back pain and could benefit from medical treatment and therapy. Doc. 10-9 at 70.

On April 20, 2018, Harris went to CED Mental Health Center, stating that he wanted to "get back on [his] medicine" from when he was in prison, which included Depakote, Paxil, and Vistaril, and which he stated had worked really well for him, though he actually preferred Prozac to Paxil. Doc. 10-9 at 46. Harris reported that he had been out of medication for two months and had been having a lot of manic episodes and trouble sleeping. Doc. 10-9 at 46. Harris was directed to resume his medications. Doc. 10-9 at 47.

On April 4, 2019, Harris saw Iris Davis at CED Mental Health Center. Doc. 10-9 at 103. Harris had no new issues, had a euthymic mood, and generally appeared

appropriate.  Doc. 10-9 at 103.  He reported that his mood and functioning were appropriate.  Doc. 10-9 at 103.  Harris reported that his only issue was poor sleep, that he had not had any shifts in mood, and that he had been fishing and spending time outdoors.  Doc. 10-9 at 104.

On May 29, 2019, Harris again saw Iris Davis at CED Mental Health Center. Doc. 10-9 at 105.  His mood was euthymic and he was generally appropriate.  Doc. 10-9 at 105.  Harris showed a good response to treatment but stated that he had anxious mood, depression, and poor sleep.  Doc. 10-9 at 106.  Harris reported mood shifts, irritability, and low mood due to depression and anxiety.  Doc. 10-9 at 107.

On September 25, 2019, Counselor Danielle White, ALC, NCC, at CED Mental Health Center filled out a Mental Health Source Statement, opining without further explanation that Harris could understand, remember, or carry out simple instructions, that Harris could maintain attention, concentration, and pace for at least two hours, that Harris could perform activities within a schedule and be punctual, and that Harris could sustain an ordinary routine without special supervision.  Doc. 10-9 at 26.  However, Counselor White stated that Harris could not adjust to routine and infrequent work changes, could not interact with supervisors or coworkers, could not maintain socially appropriate behavior, and would be off task 50% of an 8-hour workday.  Doc. 10-9 at 26.  Counselor White stated that she would expect Harris to miss 15 or more days of work per month due to his psychological

symptoms.  Doc. 10-9 at 26.

On October 11, 2019, Harris saw Nurse Judith Morris at CED Mental Health Center.   Doc. 10-9 at 41.   Harris's appearance was appropriate and he was cooperative, but he reported anxiety and mood swings and had impaired concentration.  Doc. 10-9 at 41.  Harris reported that he wanted to "get back on [his] medicine," which he said he had not been taking.  Doc. 10-9 at 42.  Harris reported that he did not "really feel depressed," but had anxiety issues that caused him to feel "antsy" and "manic" as well as "irritable and easily agitated"; he also reported that he was not sleeping well.  Doc. 10-9 at 42–43.  Harris was directed to take Depakote, Paxil, and Vistaril.  Doc. 10-9 at 43–44.

On January 1, 2020, Harris saw Counselor Danielle White at CED Mental Health Center.  Doc. 10-9 at 110.  Counselor White noted that Harris had a euthymic mood and a flat affect, with normal behavior and appropriate appearance.  Doc. 10-9 at 110.  Harris reported a "fair mood," but also continued mood swings and anxiety. Doc. 10-9 at 110.  Harris reported that he had not been able to afford his medication but was going to pick it up the next day.  Doc. 10-9 at 110.

On June 18, 2020, Harris saw Nurse Judith Morris at CED Mental Health Center.   Doc. 10-9 at 35.   Harris had appropriate appearance and interaction, euthymic mood, and was relaxed and cooperative with normal thought processes. Doc. 10-9 at 35.  Harris reported that he had been doing well, but said he was out of

medication and would like to discuss making a change.  Doc. 10-9 at 37.  Harris

stated that Paxil was causing nightmares that were waking up his wife and said that

he had previously taken Prozac with good results.  Doc. 10-9 at 37.  Harris reported

that Depakote had been very helpful and that he felt very well on his current dose

and had no depression and only a few short-term mood swings during which he was

"a little irritable or snappy."  Doc. 10-9 at 37.

On August 16, 2020, Harris filled out an adult function report.  Doc. 10-7 at

24–31.  Harris stated that he suffered from pain, bipolar, anxiety, and depression on

a daily basis.  Doc. 10-7 at 24.  Harris reported that he lived in a house with family.

Doc. 10-7 at 23.  He reported that he usually got up in the morning, got dressed,

brushed his teeth, combed his hair, ate breakfast, helped his mother around the house

as much as he could, watched television, did things on his phone, and sometimes

read.  Doc. 10-7 at 25.  Harris stated that he did not take care of any people or pets.

Doc. 10-7 at 25.  Harris stated that he had no problem with personal care.  Doc. 10-

7 at 25.  Harris reported that he was "very forgetful at times" and needed reminders

to take his medication.  Doc. 10-7 at 26.

Harris reported that he was able to prepare his own simple meals, sometimes

do laundry, and sometimes sweep.  Doc. 10-7 at 26.  Harris stated that he went

outside three or four times per week, and could ride in—but did not own—a car.

Doc. 10-7 at 27.  Harris stated that he shopped in stores, primarily for food, once

11

every few weeks.  Doc. 10-7 at 27.  He stated that he could not pay bills, handle a savings account, or use a checkbook because he did not "have any money coming in."  Doc. 10-7 at 27.

Harris reported that he talked or texted with people daily, but did not go many places other than the grocery store, and did not like "being in big crowds."  Doc. 10-7 at 28.  Harris stated that he could follow written instructions "pretty well," but could not follow spoken instructions as well, and got along "pretty well" with authority figures.  Doc. 10-7 at 29.  Harris stated that he did not handle stress very well and did not handle changes in routine very well.  Doc. 10-7 at 30.

Also on August 16, 2020, Debra Stallings (Harris's mother) filled out a third-party function report for Harris.  Doc. 10-7 at 16–23.  Stallings reported that Harris had pain, bipolar disease, anxiety attacks, and depression.  Doc. 10-7 at 16.  Stallings stated that Harris primarily spent his days playing on his phone and watching television, and that he had trouble sleeping.  Doc. 10-7 at 17.  Stallings stated that Harris could dress himself and care for his hygiene, could prepare simple meals, and could "sweep a little at times," but could not stand for very long at a time.  Doc. 10-7 at 17–18.  Stallings stated that Harris did not often go outside, did not own a vehicle but could ride in a car, and could shop for food when she took him to the store "once every couple of weeks."  Doc. 10-7 at 19.

Stallings reported that Harris "can't deal with a crowd of [people], he gets

very nervous and has to go to his room." Doc. 10-7 at 21. She stated that he "gets along with [people] ok, just not a long time at a time." Doc. 10-7 at 21. Stallings stated that Harris could pay attention for 30 minutes or a little longer, finished things he started, could follow written instructions, could not follow verbal instructions well, got along "ok" with authority figures, did not handle stress well, and did not handle changes in routine well. Doc. 10-7 at 21–22.

On September 10, 2020, Harris saw Nurse Judith Morris at CED Mental Health Center. Doc. 10-9 at 28. Harris had an appropriate appearance and interaction, a euthymic mood, and was relaxed and cooperative with normal thought processes. Doc. 10-9 at 28. Harris was taking Depakote, Vistaril, and Prozac. Doc. 10-9 at 30. Harris reported that he had "been doing pretty good," was sleeping better, was having fewer nightmares, and had been less irritable. Doc. 10-9 at 30. Harris "said he does not believe he has had any depression in quite a while," and said that he had not had mood swings since his medication changed. Doc. 10-9 at 30. Harris stated that he still got anxious in crowds. Doc. 10-9 at 30. Harris denied "any overarching depression, anxiety, anger, or mood lability." Doc. 10-9 at 30. Harris stated that Depakote was "very helpful for his mood." Doc. 10-9 at 31.

On October 5, 2020, Harris saw April Reed at CED Mental Health Center for therapy. Doc. 10-14 at 48. His mood was euthymic and he had appropriate appearance. Doc. 10-14 at 48. Harris reported continued problems with his sleep,

13

but reported that his anxiety and depression had decreased.  Doc. 10-14 at 49.

On October 31, 2020, Harris had a disability medical exam with Nurse Marla Byrum.  Doc. 10-9 at 53.  Harris reported a history of anxiety, PTSD, and bipolar disorder, but stated that "he is controlled with medication."  Doc. 10-9 at 53.  At the time, Harris was taking Vistaril, Prozac, and Depakote.  Doc. 10-9 at 53.  Harris denied any gastrointestinal symptoms and stated that he had a good appetite.  Doc. 10-9 at 54.  Byrum performed a physical examination.  Doc. 10-9 at 54–56.  Byrum submitted a source statement diagnosing Harris with conditions including low back pain, bipolar, depression, PTSD, anxiety, and obesity.  Doc. 10-9 at 56.  Byrum noted that Harris felt his bipolar was "controlled with current regimen."  Doc. 10-9 at 56.

On November 25, 2020, Harris saw April Reed at CED Mental Health Center for therapy.  Doc. 10-14 at 44.  Harris had a euthymic mood and appropriate appearance.  Doc. 10-14 at 44.  Harris was not experiencing depressed mood, irritability, or mood swings, but had occasional problems with sleep.  Doc. 10-14 at 45.  He was taking his medication as prescribed.  Doc. 10-14 at 45.

On January 19, 2021, Harris saw April Reed for therapy at CED Mental Health Center.  Doc. 10-14 at 40.  Harris had a euthymic mood and appropriate appearance.  Doc. 10-14 at 41.  Harris reported no symptoms of depressed mood, irritability, or mood swings, but had occasional problems with sleep.  Doc. 10-14 at 41.  Harris reported taking his medication as prescribed.  Doc. 10-14 at 41.

On March 8, 2021, Harris again saw April Reed for therapy at CED Mental Health Center.  Doc. 10-14 at 36.  Harris had appropriate appearance and a euthymic mood.  Doc. 10-14 at 36.  Harris reported that he was taking his medication as prescribed and had no depressed mood, no irritability, and no mood swings, but did have occasional problems with sleep.  Doc. 10-14 at 37.

On March 30, 2021, Harris saw Nurse Judith Morris at CED Mental Health Center.  Doc. 10-14 at 30.  Harris was relaxed and cooperative, had appropriate appearance, and had a euthymic mood with normal thought processes.  Doc. 10-14 at 30.

On June 7, 2021, Harris underwent a disability determination and comprehensive evaluation with psychologist Dr. June Nichols.  Doc. 10-14 at 52.  Dr. Nichols summarized Harris's medical and personal history.  Doc. 10-14 at 52–55.  Harris reported that he still had depressive symptoms, but they were better with medication.  Doc. 10-14 at 54.  He reported that he had "bouts of anxiety," but they were "more social anxiety or certain situations."  Doc. 10-14 at 54.  He also reported bad dreams that woke him up.  Doc. 10-14 at 54.  Harris was taking Vistaril, Depakote, and Prozac.  Doc. 10-14 at 54.

During the evaluation, Dr. Nichols noted that Harris presented as neat and clean, had fair eye contact, had normal speech, and had an appropriate affect.  Doc. 10-14 at 55.  Harris had a dysthymic mood but congruent thought processes and

15

reported problems sleeping.  Doc. 10-14 at 55.

Dr. Nichols noted that Harris had clear stream of consciousness and normal orientation and thought processes with no evidence of confusion.  Doc. 10-14 at 55. Harris reported that "[s]ometimes it will bother [him] that people are around and other times it won't," and said that "[n]ine times out of ten [he] will handle it," but if he gets anxious he is "irritable."  Doc. 10-14 at 55.  Harris stated that he had panic attacks, but that they were not as bad as they had been in the past.  Doc. 10-14 at 55. Dr. Nichols noted that Harris appeared to have good judgment and insight and normal intelligence.  Doc. 10-14 at 55.  Dr. Nichols found Harris's speed of mental processing was fair, and his memory functions appeared to be intact.  Doc. 10-14 at 55.  She noted that Harris's daily tasks included feeding dogs, household chores, and going grocery shopping when needed.  Doc. 10-14 at 55.  Harris reported that, in the past six months, he had experienced symptoms including depressed mood, sleep disturbance, agitation, poor concentration, feelings of panic, anxiety in social settings, and forgetfulness.  Doc. 10-14 at 56.

Dr. Nichols noted that Harris "demonstrates ongoing issues with cycling between depression and mania" and "continues to experience panic attacks and nightmares."  Doc. 10-14 at 56.  Harris reported that he was uncomfortable around large groups of people and did not like to feel "trapped."  Doc. 10-14 at 56.  Harris also stated that, when he feels overwhelmed, he becomes "irritable," and that he had

16

problems with concentration and agitation.  Doc. 10-14 at 56.

Dr. Nichols opined that Harris would be able to understand, remember, or carry out very simple instructions, but would not be able to maintain attention, concentration, and/or pace for at least two hours.  Doc. 10-14 at 56.  She opined that Harris would be able to work within a schedule and be punctual "if his medication were working as prescribed."  Doc. 10-14 at 56.  She opined that he could maintain an ordinary routine without special supervision but would "likely have difficulty adjusting to routine and infrequent work changes."  Doc. 10-14 at 56.  Dr. Nichols stated that Harris "would not be able to interact with supervisors and/or coworkers on an ongoing basis," but would be able to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Doc. 10-14 at 56.

Dr. Nichols opined that Harris would "likely be off task 10–20% of an 8-hour work day" and "would likely fail to report to work 4 or 5 days out of a 30-day period, due to his psychological symptoms."  Doc. 10-14 at 56.  She stated that his limitations existed back to January 2018, and that his medications could make him drowsy or slow to react.  Doc. 10-14 at 56.  Dr. Nichols diagnosed Harris with "Panic Disorder, partially resolved," "social anxiety," and "Major Depressive Disorder, recurrent, Moderate," as well as back problems and pain.  Doc. 10-14 at 56–57.

Dr. Nichols filled out a corresponding Mental Health Source Statement indicating that Harris could understand, remember, or carry out simple instructions,

17

could not maintain attention, concentration, and/or pace for periods of at least two hours, could perform activities within a schedule and be punctual, could sustain an ordinary routine without special supervision, could not adjust to routine and infrequent work changes, could not interact with supervisors and/or coworkers, and could maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness with medication.  Doc. 10-14 at 58.  Dr. Nichols stated that she would expect Harris to be off task for 10% to 20% of an 8-hour workday, and would expect him to miss 4 to 5 days of work out of every 30-day period.  Doc. 10-14 at 58.

### B.    Social Security proceedings

#### 1.    Initial application and denial of benefits

In August 2020, Harris applied for SSI benefits under Title XVI of the Social Security Act based on bipolar disorder, anxiety, PTSD, and a herniated disc and pinched nerve in his lower back, with an onset date of August 9, 2019.  Doc. 10-4 at 29: Doc. 10-6 at 2–3.  In November 2020, Harris's application was initially denied based on a finding that he was not disabled.  Doc. 10-4 at 28–49.  The denial was based in part on assessments from agency consultant Dr. Robert Estock that Harris had only moderate limitations.  Doc. 10-4 at 34–37.

Harris requested reconsideration of the initial denial of his application for benefits.  Doc. 10-5 at 8.  On reconsideration in December 2020, Harris's claim again

was denied, with agency consultant Dr. Gloria Roque assessing only moderate limitations.  Doc. 10-4 at 50–72; Doc. 10-5 at 9–10.

Through counsel, Harris requested a hearing before an ALJ (Doc. 10-5 at 17), and a telephonic hearing was held on September 2, 2021.  Doc. 10-3 at 36–38.

On November 2, 2021, the ALJ issued an unfavorable decision, finding that Harris was not disabled under the Social Security Act.  Doc. 10-3 at 16–30.

### 2.   ALJ hearing

On September 2, 2021, the ALJ conducted a telephonic hearing to determine whether Harris was entitled to benefits.  Doc. 10-3 at 36–38.  At the beginning of the hearing, the ALJ asked if Harris and his counsel had reviewed the evidentiary file, and Harris's counsel said that they had.  Doc. 10-3 at 39.  The ALJ asked if there was any outstanding evidence, and Harris's counsel mentioned only prison records from Harris's periods of incarceration from 2000 to 2017.  Doc. 10-3 at 39–40.  Harris's counsel and the ALJ concurred that there was no reason to leave the record open for those documents, "given the dates."  Doc. 10-3 at 40.  No other outstanding evidence was mentioned.  Doc. 10-3 at 39–40.

Harris testified that he lived with one of his cousins.  Doc. 10-3 at 42.  Harris's counsel stated that Harris suffered from a herniated disc in his lower back, depression with suicidal ideation that required inpatient hospitalization in 2011, bipolar disorder, anxiety disorder, migraine headaches, and irritable bowel

19

syndrome.  Doc. 10-3 at 42–43.  Counsel stated that Harris had received Social Security benefits from 1997 to 2013, but that the benefits ceased during his incarceration.  Doc. 10-3 at 43.

Harris testified that he could not work because of symptoms caused by his back problems and because of PTSD that resulted in having "night terrors constantly."  Doc. 10-3 at 43–45, 47–48.  Harris stated that he had not had surgery for his back problems because he did not have medical insurance since getting out of prison.  Doc. 10-3 at 44.  Harris testified that, because he had trouble sleeping at night, he generally spent about three to four hours per day sleeping, and stated that he was sleepy during the day even after getting enough sleep at night.  Doc. 10-3 at 45.

Harris confirmed that his medication routine consisted of Vistaril, Prozac, and Depakote.  Doc. 10-3 at 46.  Harris testified that some of his medications caused drowsiness.  Doc. 10-3 at 46.  The ALJ asked Harris if his medications "take care of all of the problems related to the depression, the bipolar, the anxiety, the PTSD, or are you still having leftover problems that still bother you."  Doc. 10-3 at 46.  Harris answered "they do," but stated that at times he still had "manic episodes" during which he was "fidgety and hyper."  Doc. 10-3 at 46.  The ALJ asked if it was a problem for Harris to get along with strangers, and Harris answered that talking to strangers had "always been a problem" for him and that he would not talk to

strangers unless it was "necessary." Doc. 10-3 at 46–47. Harris testified that he had "paranoia about talking to strangers" because he thought they "may get the wrong impressions." Doc. 10-3 at 47. Harris stated that he had trouble going out in public and doing things like shopping after his incarceration, and that his girlfriend usually helped him do the shopping or did the shopping by herself. Doc. 10-3 at 47.

The ALJ asked Harris if he still had a problem with irritable bowel syndrome, and Harris said yes. Doc. 10-3 at 48. Harris stated that he had to try to stay away from spicy or greasy food, or he would have problems all day long and have to spend half an hour in the bathroom. Doc. 10-3 at 48. Harris stated that his irritable bowel syndrome generally affected him three or four days per month and caused him to go to the bathroom three or four times per day for at least half an hour each time. Doc. 10-3 at 49. Harris testified that, when he was previously receiving Social Security benefits until 2013, it was for "the bipolar stuff and irritable bowel syndrome." Doc. 10-3 at 49. Harris testified that he had not had health insurance since August 2020. Doc. 10-3 at 50.

The ALJ asked Harris to describe a typical day, and Harris testified that he often stayed with his girlfriend—who is also disabled—and helped take care of her three dogs and her house. Doc. 10-3 at 50–51. Harris testified that the only chores he struggled with were mopping and picking up things. Doc. 10-3 at 51. He stated that he usually only left the house to go to Walmart, the grocery store, or the vet—

partially because of Covid—and he would often drive his girlfriend places but stay in the car.  Doc. 10-3 at 51.

Harris testified that he had not worked since 2006.  Doc. 10-3 at 52.

A vocational expert, Michael McClanahan, testified that a hypothetical individual of Harris's age, education, work experience, and RFC (residual functional capacity) could perform jobs that existed in significant numbers in the national economy.  Doc. 10-3 at 52–55.  McClanahan testified that a hypothetical individual could not perform jobs in the national economy, if the individual was "unable to interact with coworkers and/or supervisors," "must sleep at least three hours ou[t] of the eight-hour workday," "on three to four days per month will require three to four bathroom breaks that will last 30 minutes each," or was "unable to maintain, attention, concentration, or pace for periods of two hours or more."  Doc. 10-3 at 55–56.

### 3.    ALJ decision

On November 2, 2021, the ALJ issued an unfavorable decision on Harris's claim for benefits.  Doc. 10-3 at 16–30.  The ALJ found that Harris "has not been under a disability, as defined in the Social Security Act," since the date the application was filed.  Doc. 10-3 at 30.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 416.920(a); *Winschel*, 631 F.3d at 1178).  Doc. 10-3 at 20–21.  At

step one of the sequential process, the ALJ found that Harris had not engaged in substantial gainful activity since the application date.  Doc. 10-3 at 21.

At step two, the ALJ found that Harris had severe impairments of "anxiety, depression, lumbar degenerative disc radiculopathy, and obesity."  Doc. 10-3 at 21. The ALJ noted that, "[a]lthough the claimant reported irritable bowel syndrome, there is no documented treatment or diagnosis of this impairment," and that "[t]here are no appropriate signs, symptoms, or laboratory findings from any acceptable source to support the claimant's allegation of irritable bowel syndrome."  Doc. 10-3 at 21 (citing hearing testimony).  Accordingly, the ALJ found that "irritable bowel syndrome is not a medically determined impairment" for Harris.  Doc. 10-3 at 21.

At step three, the ALJ found that Harris did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments."  Doc. 10-3 at 19–23.  In making that finding, the ALJ considered the severity of Harris's mental impairments and found that Harris had only moderate limitations in (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting and managing oneself.  Doc. 10-3 at 22–23.

While considering the severity of Harris's mental impairments, the ALJ found that Harris had difficulty "remembering generally, completing tasks, paying bills, taking medications without reminders, and driving," but did "finish things that

he starts" and had the ability to "ask and answer questions, provide explanations, and describe his work activities." Doc. 10-3 at 22. The ALJ considered that Harris summarized his history for Dr. Nichols and was able to remember prompts and interpret proverbs. Doc. 10-3 at 22. The ALJ also considered that Harris reported that he was able to maintain his personal care and hygiene without difficulty, prepare simple meals, do household chores, shop in stores, and manage money. Doc. 10-3 at 22.

The ALJ considered that Harris reported having "difficulty spending time in crowds," but also reported being able to get along with others, shop, spend time with friends and family, deal appropriately with authority, live with others, and have good interactions during medical appointments. Doc. 10-3 at 22. The ALJ accounted for the facts that Harris said that "he becomes anxious around others if he is irritable," but that Harris also reported that "9 times out of 10 he is able to handle it." Doc. 10-3 at 22. The ALJ found that, while Harris reported that he had "limitations in concentrating, following instructions, and completing tasks," he also reported that he was able to follow written instructions "pretty well" and was able, to a lesser extent, to follow spoken instructions. Doc. 10-3 at 22. The ALJ noted that Harris reported being able to watch TV, read, play games on his phone, use Facebook, and manage his medical care, and that the record did not show any mention of distractibility or an inability to complete concentration/attention testing.

Doc. 10-3 at 23.  The ALJ considered that Harris "alleged that he has difficulties managing his mood and handling stress and changes in routine" but also reported that he can handle self-care, hygiene, and caring for pets.  Doc. 10-3 at 23.

At step four, the ALJ concluded that Harris had no past relevant work.  Doc. 10-3 at 32.  The ALJ assessed Harris's "residual functional capacity" (RFC) and found "[a]fter careful consideration of the entire record" that Harris "has the residual functional capacity to perform light work," except that that he "can frequently climb ramps and stairs, but can never climb ropes, ladders or scaffolds," that he "can frequently balance, stoop, kneel, crouch, and crawl," and that he "can tolerate occasional exposure to vibration but should have no exposure to unprotected heights or hazardous machinery."  Doc. 10-3 at 23.

With respect to Harris's mental limitations, the ALJ's RFC determination included findings that Harris "can understand and remember simple instructions," "can maintain attention and concentration to carry out simple instructions in at least 2-hour intervals over an 8-hour day with customary work breaks," "can tolerate occasional contact with the general public," and "can adapt to infrequent, well-explained changes in the work environment."  Doc. 10-3 at 23.

The ALJ considered all of Harris's symptoms and the extent to which they reasonably could be accepted as consistent with the objective medical evidence and other evidence, according to the requirements of 20 C.F.R. § 416.929 and SSR

(Social Security Ruling) 16-3p.  Doc. 10-3 at 24.  The ALJ also considered medical opinions and prior administrative medical findings.  Doc. 10-3 at 24.

In assessing Harris's RFC and the extent to which Harris's symptoms limited his functioning, the ALJ stated that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 10-3 at 24.

In determining Harris's RFC, the ALJ stated that Harris alleged that he was disabled "because of bipolar disorder, anxiety, posttraumatic stress disorder (PTSD), and a herniated disk and pinched nerve in his lower back" that caused pain and numbness.  Doc. 10-3 at 24.  The ALJ also noted that Harris reported experiencing "mood swings, irritability, depressed mood, and sleep disturbance," as well as "social anxiety and bad dreams (night terrors)."  Doc. 10-3 at 24.  The ALJ found that Harris's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Harris's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Doc. 10-3 at 24.

26

The ALJ considered the consultative examination by Jon Rogers, Ph.D., which stated that Harris had mild impairments in his abilities to understand instruction, moderate impairments in his ability to respond appropriately to supervision and coworkers, and mild impairment in his ability to respond appropriately to work pressures.  Doc. 10-3 at 24.

The ALJ took into consideration Harris's history of treatment for bipolar disorder at CED Mental Health Center.  Doc. 10-3 at 24.  The ALJ noted that Harris requested that he be put back on his medication in October 2019, and that his medications were restarted.  Doc. 10-3 at 25.  The ALJ stated that, in June 2020, Harris requested a change in the medication Paxil because it gave him nightmares, but reported that Depakote had been very helpful and that he had only had a few mood swings that caused him to be "a little irritable or snappy."  Doc. 10-3 at 25. The ALJ noted that, at that appointment, Harris reported that he was still anxious in crowds but was not depressed, and his mental status was essentially normal.  Doc. 10-3 at 25.

The ALJ considered that, at an appointment on September 10, 2020, Harris stated that he had "been doing pretty good," had been having fewer nightmares, had been "much less irritable," was not depressed, and was responding well to Depakote.  Doc. 10-3 at 25.  The ALJ noted that Harris reported still having trouble with crowds but not feeling that he needed to change his medication and denying

"any overarching depression, anxiety, anger, or mood lability."  Doc. 10-3 at 25.

The ALJ found that subsequent treatment records showed significant improvement

in mood swings, irritability, and depressed mood as his medication was "really

helping."  Doc. 10-3 at 24.

   The ALJ provided an in-depth summary of the opinion of Dr. June Nichols,

finding that, "[d]espite the lack of any marked findings documented on a mental

status examination," Dr. Nichols "assessed significant functional limitations."  Doc.

10-3 at 26.  The ALJ found that state agency consultants Robert Estock and Gloria

Roque both opined that Harris had no more than moderate limitation in functioning.

Doc. 10-3 at 26.

   The ALJ considered Harris's obesity and his symptoms related to his lower

back issues.   Doc. 10-3 at 26–27.   The ALJ found that Harris's physical

impairments allowed him to perform a range of light work.  Doc. 10-3 at 27.

   The ALJ found the opinions of the agency psychological consultants (Estock

and Roque) to be generally persuasive because the assessment of moderate

limitations was "consistent with the significant improvement in symptoms with

treatment documented at CED Mental Health" and was "consistent with [Harris's]

own reports that his bipolar disorder was well-controlled on his current medication

regimen."  Doc. 10-3 at 28.  The ALJ found that the opinion of Dr. Rogers was

"generally persuasive" because it was consistent with treatment notes showing that

Harris's bipolar disorder was well controlled on medication.  Doc. 10-3 at 28.

The ALJ found that the opinion of Counselor Danielle White, ALC-NCC was "not persuasive" because Counselor White was "not an acceptable medical source" and "the extreme limitations assessed are not consistent with subsequent CED Mental Health records documenting substantial improvement in [Harris's] symptoms of bipolar disorder."  Doc. 10-3 at 18.

The ALJ found the opinions of Dr. Nichols "partially persuasive" because the record supported a finding that Harris can understand, remember, and carry out simple instructions, but "the record does not support the additional extreme limitations assessed by Dr. Nichols."  Doc. 10-3 at 28.  The ALJ found that Dr. Nichols' opinion was "inconsistent with Dr. Nichols' own examination, which showed normal processing speed and memory and average intellectual functioning."  Doc. 10-3.  The ALJ also found that Dr. Nichols' examination did not "support a finding that [Harris] would have difficulty adapting to infrequent, routine changes, as the record shows he can drive, shop, get along well with others, care for pets, and handle his social anxiety."  Doc. 10-3 at 28.

At step five, after considering Harris's age, education, work experience, and RFC, the ALJ found that "there [were] jobs that exist in significant numbers in the national economy that [Harris] can perform."  Doc. 10-3 at 29.

Consequently, the ALJ determined that Harris was not disabled under the

Social Security Act.  Doc. 10-3 at 30.

### 4.  Appeals Council decision

On April 6, 2022, the Appeals Council denied Harris's request for review of the ALJ's November 2, 2021 decision, finding no reason to review the ALJ's decision.  Doc. 10-3 at 2–6.  Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I.  The ALJ properly assessed the opinions of Dr. June Nichols according to the applicable regulations, and substantial evidence supported the ALJ's decision to find that some of Dr. Nichols' opinions were not supported by and were not consistent with the record evidence.

The ALJ properly assessed the opinions of Dr. June Nichols pursuant to the applicable regulations, and substantial evidence supported the ALJ's finding that some of Dr. Nichols' opinions were not supported by and were not consistent with the record evidence.  In his briefing, Harris argues that "the ALJ erred in [the] treatment of the Nichols opinion" because the ALJ's decision was "improperly conclusory" and did not sufficiently articulate the supportability and consistency of Dr. Nichols' opinions.  Doc. 14 at 11–20.  Harris also argues that the ALJ's decision

does not comply with the Eleventh Circuit's decision in *Schink v. Commissioner of Social Security*, 935 F.3d 1245 (11th Cir. 2019).  Doc. 14 at 14–20.

The SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claim in this case.  Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating or examining physician.  20 C.F.R. § 416.920c(a).  And the Eleventh Circuit has found that the SSA's new regulations validly abrogated the so-called "treating-physician rule," such that an ALJ no longer is required to defer to the medical opinion of a treating physician.  *See Harner v. Social Sec. Admin, Comm'r*, 38 F.4th 892 (11th Cir. 2022).

Instead, the ALJ considers the persuasiveness of a medical opinion according to the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. § 416.920c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. § 416.920c(b)(2).

"Supportability" requires an ALJ to consider that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  "Consistency" requires an ALJ to consider that "[t]he more consistent a medical opinion[] or prior administrative medical finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be."  20 C.F.R. § 416.920c(c)(2).  The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R. § 416.920c(b)(2).

In this case, the ALJ properly applied those new, revised regulations.  As noted above, Dr. Nichols opined that Harris would be able to understand, remember, or carry out very simple instructions, but would not be able to maintain attention, concentration, and/or pace for at least two hours, and would be able to work within a schedule and be punctual "if his medication were working as prescribed."  Doc. 10-14 at 56, 58.  Dr. Nichols opined that he could maintain an ordinary routine without special supervision but would "likely have difficulty adjusting to routine and infrequent work changes" and "would not be able to interact with supervisors and/or coworkers on an ongoing basis," but would be able to maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness.  Doc. 10-14 at 56, 58.  Dr. Nichols opined that Harris would "likely be off task 10–20% of an 8-hour work day" and "would likely fail to report to work 4 or 5 days out of a 30-day period, due to his psychological symptoms."  Doc. 10-14 at 56, 58.

The ALJ found that the opinions of Dr. Nichols were "partially persuasive" because the record supported a finding that Harris can understand, remember, and carry out simple instructions, but "the record does not support the additional extreme limitations assessed by Dr. Nichols."  Doc. 10-3 at 28 (citing exhibits).  The ALJ found that Dr. Nichols' opinions were "inconsistent with Dr. Nichols' own examination, which showed normal processing speed and memory and average intellectual functioning."  Doc. 10-3 at 28.  The ALJ also found that Dr. Nichols' examination did not "support a finding that [Harris] would have difficulty adapting to infrequent, routine changes, as the record shows he can drive, shop, get along well with others, care for pets, and handle his social anxiety."  Doc. 10-3 at 28 (citing exhibits).  The ALJ also summarized Dr. Nichols' opinions in detail elsewhere in the RFC assessment and noted that, "[d]espite the lack of any marked findings documented on a mental status examination," Dr. Nichols "assessed significant functional limitations."  Doc. 10-3 at 26.

According to the applicable regulations, the ALJ had to consider and explain the supportability and consistency of Dr. Nichols' opinions.   20 C.F.R.

§ 416.920c(b)(2). Here, the ALJ's decision shows that the ALJ properly considered and explained the lack of supportability and consistency in some of Dr. Nichols' opinions.

First, the ALJ's rejection of parts of Dr. Nichols' opinions was not so conclusory as to be insufficient. *See* Doc. 14 at 14–15. As an initial matter, the ALJ did not summarily reject the opinions of Dr. Nichols, but found them partially persuasive. *See* Doc. 10-3 at 28. The ALJ found that the record supported a finding that Harris could understand, remember, and carry out simple instructions. Doc. 10-3 at 28 (citing exhibits). The ALJ then explained that other parts of the opinions were not persuasive as they were inconsistent with Dr. Nichols' examination notes and the record, providing specific examples. Doc. 10-3 at 28. So, the ALJ did not merely provide a summary or conclusory rejection of Dr. Nichols' opinions, but examined specific portions of the opinions in light of the supportability and consistency of those opinions (*see* 20 C.F.R. § 416.920c(c)) and provided explanation for the rejection of parts of the opinions.

Further, in assessing the supportability and consistency of Dr. Nichols' opinions, the ALJ found genuine inconsistencies between Dr. Nichols' examination notes and the record, and Dr. Nichols' opinions regarding Harris's limitations. *See* Doc. 14 at 15–18. The ALJ found, for example, that Dr. Nichols assessed extreme limitations for Harris—including in his ability to maintain attention and

concentration, to stay on task, and to interact with supervisors and/or coworkers—
that were not supported by the results of her examination, which noted his normal
processing speed, memory, and intellectual functioning.  Doc. 10-3 at 28.  The ALJ
also found that Dr. Nichols' opinion that Harris would have difficulty adapting to
infrequent, routine changes was not supported by her examination or consistent with
the record, which showed that Harris could "drive, shop, get along well with others,
care for pets, and handle his social anxiety."  Doc. 10-3 at 28 (citing exhibits).

Harris argues that these inconsistencies are not genuine because Harris's
intellectual functioning and ability to drive, shop, and care for pets are not related to
his impairments or to the limitations assessed by Dr. Nichols.  Doc. 14 at 15–18.
But—in light of the severity of the limitations assessed by Dr. Nichols—multiple
relatively normal findings during Dr. Nichols' examination and in the record *do*
create genuine inconsistencies.  In other words, the ALJ found that the many
essentially normal findings in Dr. Nichols' evaluation and in the record did not
support and were not consistent with the severity of the limitations in Dr. Nichols'
opinions—particularly given that Dr. Nichols did not specifically explain the bases
for her opinions on Harris's limitations.  More specifically, the many essentially
normal findings in Dr. Nichols' evaluation and in the record also do not appear
consistent with the severity of Dr. Nichols' assessed limitations regarding Harris's
abilities to maintain attention and concentration and to interact with supervisors

and/or coworkers.  *See* Doc. 10-14 at 56.

The record also supports the ALJ's finding that there were genuine inconsistencies between Dr. Nichols' limitations and record evidence that Harris could handle his social anxiety.  *See* Doc. 14 at 18–20.  First, as discussed above, the ALJ noted that the record showed that Harris could do activities requiring leaving his home and interacting with people, including shopping and getting along with others.  Doc. 10-3 at 28.  Moreover, throughout the ALJ's decision, the ALJ described in detail portions of the record that were inconsistent with the limitations assessed by Dr. Nichols, including indications in the record that Harris's medication was "really helping," that he was anxious in crowds but otherwise generally had essentially normal mental status, that he reported being able to engage in activities like reading and playing games on his phone, that he could finish things he started, and that he was able to get along with friends and family and deal appropriately with authority.  Doc. 10-3 at 22–25.

Thus, in finding some of Dr. Nichols' opinions unpersuasive, the ALJ found that Dr. Nichols' opinions were not supported by, and were inconsistent with, both Dr. Nichols' own treatment notes and the other record evidence.  *See* 20 C.F.R. § 416.920c(c).  As a result, the ALJ properly applied the new, revised regulations in finding some of Dr. Nichols' opinions unpersuasive.  *See* 20 C.F.R. § 416.920c(c).  This was the ALJ's reasoning and finding, and not any post hoc rationalization

proffered by the Commissioner. *See* Doc. 17 at 2–3.

In addition, substantial evidence supported the ALJ's findings regarding the lack of supportability and consistency with respect to Dr. Nichols' opinions.

As noted by the ALJ, Dr. Nichols stated that Harris would have relatively extreme limitations, including that Harris could not maintain attention, concentration and pace for at least two hours, would have difficulty adjusting to even routine and infrequent work changes, would not be able to interact with supervisors and/or coworkers on an ongoing basis at all, would be off task 10% to 20% of a workday, and would fail to report for work 4 to 5 days per month due to his psychological symptoms. Doc. 10-14 at 56, 58. But Dr. Nichols' own notes from her evaluation do not support such extreme limitations. Harris told Dr. Nichols that his symptoms were better with medication. Doc. 10-14 at 54. He also stated that, while he had "bouts" of anxiety, it was centered around "certain situations." Doc. 10-14 at 54. Harris presented at the appointment with Dr. Nichols with good hygiene, normal speech, and appropriate affect, as well as normal thought processes without confusion, good judgment, and normal intelligence. Doc. 10-14 at 55. Harris said that "sometimes" it would bother him when people were around, but other times it did not bother him, and said that 9 out of 10 times when he got anxious he would "handle it," but could get "irritable" if he gets anxious. Doc. 10-14 at 55. Harris reported that his main issues with anxiety were in large groups or when he felt

trapped. Doc. 10-14 at 56. Even Dr. Nichols' own diagnoses reflected that Harris's panic disorder was partially resolved, and that his depressive disorder was moderate. Doc. 10-14 at 56–57. Dr. Nichols' observations from her evaluation show no clear basis for the extreme limitations that Dr. Nichols' opined Harris would need, and—because Dr. Nichols' opinions provide no explanation for why Harris would be so limited—those observations do not support Dr. Nichols' opinions about Harris's limitations.

Furthermore, Dr. Nichols' opinions that Harris would have such severe limitations are inconsistent with other record evidence. The record shows that, as early as his appointment with Dr. Rogers in 2018, medication was very helpful in managing Harris's conditions. Doc. 10-9 at 19. While Dr. Rogers noted symptoms in his evaluation that appear similar to, if not worse than, those noted by Dr. Nichols—including a reported inability to get along with people and a general tendency to feel "not too good"—Dr. Rogers assessed only mild to moderate limitations. Doc. 10-9 at 19–25. Additionally, Harris's appointments at CED Mental Health Center showed that Harris had good response to treatment with medication. *See, e.g.*, Doc. 10-9 at 30–31, 106. For instance, when he saw Nurse Judith Morris in June 2020, Harris reported that Depakote had been very helpful and that he had only had a few short-term mood swings that left him a little irritable or snappy. Doc. 10-9 at 37.

The function reports filled out by Harris and his mother indicated that Harris could perform tasks around the house, finish things he started, interact with friends, get along with authority figures, and go shopping, though he did not like crowds. Doc. 10-7 at 16–30.  In fact, most of Harris's reports of anxiety around people centered around large crowds.  Doc. 10-7 at 21, 28; Doc. 10-9 at 30, Doc. 10-14 at 56.  During his October 31, 2020 disability exam, Harris reported to Nurse Marla Byrum that his conditions, including anxiety, PTSD, and bipolar were "controlled with medication."  Doc. 10-9 at 53, 56.  During his visits to CED Mental Health Center in late 2020 and 2021, Harris consistently presented with a euthymic mood and appropriate appearance and, though he reported sleep issues, denied having problems with his mood. Doc. 10-14 at 30, 37, 41, 45.  Additionally, in his testimony at the hearing before the ALJ, Harris stated that his medications had mostly taken care of his problems related to depression, bipolar, anxiety, and PTSD, though he still had some fidgety and hyper periods and had trouble talking to strangers unless it was necessary.   Doc. 10-3 at 46.   Thus, the record shows that Harris's psychological impairments were reasonably managed with medication, and that Harris's impairments did not cause limitations at the extreme level suggested by Dr. Nichols.

Nevertheless, Harris argues that the ALJ's finding that some of Dr. Nichols' opinions were not persuasive conflicts with the Eleventh Circuit's decision in

*Schink*.  Doc. 14 at 14–20.  In *Schink*, the Eleventh Circuit—applying the treating physician rule that has been superseded and abrogated by the new, applicable regulations, *see Harner*, 38 F.4th at 892—held that an ALJ erred in discounting the opinions of treating physicians who opined that the claimant's bipolar disorder was severe and disabling.  *Schink*, 935 F.3d at 1259–64.  In reaching that decision, the Eleventh Circuit focused on multiple factors, including that the ALJ favored the opinions of a non-examining consultative physician over the opinions of the treating physicians, improperly relied on a finding of "sporadic treatment" by the treating physicians, improperly rejected the format of the opinions, and improperly found that the opinions were inconsistent with the record.  *Id.*  The Eleventh Circuit noted that the record as a whole was consistent with the well supported opinions of the treating physicians that the claimant was severely limited by his bipolar disorder, where the physicians had opined that the claimant demonstrated ongoing mood issues, problematic affect, and notable problems with attitude.  *Id.* at 1260–64.  The Eleventh Circuit also noted that "the bulk of the treatment notes support the notion that [the claimant's] mental impairments continued well beyond his brief periods of stability," and stated that "people with chronic diseases can experience good and bad days," and that, "when bad days are extremely bad and occur with some frequency, they can severely affect a person's ability to work."  *Id.* at 1267.

Even disregarding the reality that the treating physician rule is no longer

applicable (*see Harner*, 38 F.4th 892), *Schink* is distinguishable from this case.  In *Schink*, the treating physicians whose opinions the ALJ discounted had assessed and/or treated the claimant on multiple occasions and treatment notes indicated continuing serious issues from bipolar disorder that supported opinions of marked or extreme limitations.  *Schink*, 935 F.3d at 1252–56.  But Dr. Nichols only saw Harris on one occasion and her evaluation notes do not show a clear basis for the extreme limitations that she assessed in her opinions.   Doc. 10-14 at 52–58.  Moreover, unlike in *Schink*, the record in this case includes numerous instances of Harris reporting either minor or no problems with his mood and stating that his medication was extremely helpful in controlling the symptoms of his bipolar disorder.  *See, e.g.*, Doc. 10-9 at 19, 30–31, 37, 53; Doc. 10-14 at 41, 45, 49; Doc. 10-3 at 46.  While *Schink* provides that mental illness can be cyclical and that people with frequent "extremely bad" days might not be able to work (935 F.3d at 1267), the record in this case supports a finding that Harris did not have extremely bad days with such a disabling frequency.  Accordingly, the ALJ's finding that some of Dr. Nichols' opinions were not persuasive does not conflict with *Schink*.

The court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings."  *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).  Here, there is sufficient evidence that a reasonable person would find

adequate to support the ALJ's finding that some of Dr. Nichols' opinions were unpersuasive because her own notes and the record did not support and were not consistent with those opinions. *See id.* Consequently, substantial evidence supported the ALJ's findings regarding Dr. Nichols' opinions. *See id.*

## II. The ALJ properly assessed the opinion of Counselor Danielle White, and substantial evidence supported the ALJ's finding that the opinion was not persuasive.

The ALJ properly assessed the opinion of Counselor Danielle White and substantial evidence supported the finding that the opinion was not persuasive. In his briefing, Harris recognizes (as he must) that the ALJ was not required to consider Counselor White's opinion pursuant to 20 C.F.R. § 416.920c because she was not an acceptable medical source[1]; nevertheless, Harris argues that the ALJ "improperly dismissed" the opinion of Counselor White because the ALJ was required to consider the evidence. Doc. 14 at 20–23. Moreover, Harris argues that the ALJ's failure to consider Counselor White's opinion as "valid and persuasive" evidence conflicts with *Schink*. Doc. 14 at 22–23.

"In making any determination with respect to whether an individual is under a disability or continues to be under a disability, the Commissioner of Social Security shall consider all evidence available in such individual's case record." 42 U.S.C.

---

[1] *See* 20 C.F.R. § 416.902 (listing acceptable medical sources and not including counselors).

§ 423(d)(5)(B).  However, an ALJ is "not required to articulate how [the ALJ] considered evidence from nonmedical sources using the requirements" for acceptable medical sources.  20 C.F.R. § 416.920c(d).  Here, the ALJ explicitly considered Counselor White's opinion and directly addressed it, but found it unpersuasive.

On September 25, 2019, Counselor White filled out a Mental Health Source Statement, opining without further explanation that Harris could do some things, but that he could not adjust to routine and infrequent work changes, could not interact with supervisors or coworkers, could not maintain socially appropriate behavior, would be off task 50% of an 8-hour workday, and would miss 15 or more days of work per month due to his psychological symptoms.  Doc. 10-9 at 26.  The ALJ made an explicit finding that White's opinion was not persuasive because she was not an acceptable medical source and because "the extreme limitations assessed are not consistent with subsequent CED Mental Health records documenting substantial improvement in the claimant's symptoms of bipolar disorder."  Doc. 10-3 at 28 (citing exhibits).  Again, this was the ALJ's reasoning and finding, and not any post hoc rationalization proffered by the Commissioner.  *See* Doc. 17 at 7.

Further, substantial evidence supported the ALJ's decision to find Counselor White's opinion unpersuasive.  Like the opinion of Dr. Nichols discussed above (*see supra* Part I), Counselor White's opinion assessed extreme limitations.  *See* Doc. 10-

9 at 26.  Counselor White's opinion was not supported by any clear explanation or any treatment records.  Moreover, as discussed above (*see supra* Part I), Harris's medical records show that his conditions were largely effectively controlled with medication.  *See, e.g.*, Doc. 10-9 at 30–31, 37, 41, 45, 53, 56, 106; Doc. 10-3 at 46. As such, substantial evidence supported a finding that the extreme limitations assessed by Counselor White—which were even more extreme than those assessed by Dr. Nichols—were not consistent with the record.

Harris also argues that the ALJ erred in discounting White's opinion because *Schink* recognizes that people with mental impairments have good days and bad days due to the episodic nature of the impairments, and because the ALJ incorrectly concluded that Harris's impairments had been permanently cured.  Doc. 14 at 22–23.  As an initial matter, the ALJ's decision includes no finding that Harris was cured.  *See* Doc. 10-3 at 19–30.  Further, as discussed above, the inconsistencies between the record evidence in this case and the extreme limitations assessed by Dr. Nichols and Counselor White differentiate this case from *Schink*.  *See Schink*, 935 F.3d at 1259–64; *supra* Part I.  While episodic mental illness can be a basis for a finding of disability (as in *Schink*), the record in this case simply does not include an evidentiary basis that is comparable to the record in *Schink* and that would make the ALJ's finding erroneous.

In sum, there is sufficient evidence that a reasonable person would find

adequate to support the ALJ's finding that Counsel White's opinion was unpersuasive.  *See Crawford*, 363 F.3d at 1158.

**III.    The ALJ did not fail to develop the record regarding Harris's IBS, and substantial evidence supported the decision to find that Harris's IBS was not a medically determinable impairment.**

The ALJ did not fail to adequately develop the record regarding Harris's IBS, and substantial evidence supported the finding that Harris's IBS did not qualify as a medically determinable impairment.  In his briefing, Harris argues that the ALJ failed in the obligation to develop the record by failing to obtain the records from Harris's previous disability proceedings predating 2013, which would have showed more information about his IBS.  Doc. 14 at 23–26.

At step two of the five-part sequential test, the ALJ found that, "[a]lthough [Harris] reported irritable bowel syndrome, there is no documented treatment or diagnosis of this impairment."  Doc. 10-3 at 21.  The ALJ found that "[t]here are no appropriate signs, symptoms, or laboratory findings from any acceptable source to support [Harris's] allegation of irritable bowel syndrome"; consequently, the ALJ found that Harris's irritable bowel syndrome was not a medically determinable impairment.  Doc. 10-3 at 21.

To establish a medically determinable impairment, a claimant must "establish[] by objective medical evidence from an acceptable medical source" that the impairment "result[s] from anatomical, physiological, or psychological

45

abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques"; a claimant cannot simply rely on his "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment." 20 C.F.R. § 416.921. Here, the record before the ALJ included Harris's testimony that he suffered from IBS, and self-reported diagnoses of IBS, but no objective medical evidence showing that Harris suffered from IBS. *See* Doc. 10-3 at 48–49; Doc. 10-13 at 66; Doc. 10-14 at 14, 23. In fact, the medical records before the ALJ actually showed occasions on which Harris reported that he did not have any gastrointestinal complaints. Doc. 10-9 at 69; Doc. 10-9 at 54. Accordingly, based on the record before the ALJ, substantial evidence supported the finding that Harris's IBS did not qualify as a medically determinable impairment.

Further, Harris has not shown that the ALJ erred in failing to adequately develop the record to make that finding. "The ALJ has a basic duty to develop a full and fair record." *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015). By statute, the Commissioner must "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B). Applicable regulations further clarify that the Commissioner has the responsibility to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] file[s] [his] application unless there is

a reason to believe that development of an earlier period is necessary or unless [the claimant] say[s] that [his] disability began less than 12 months before [he] filed [his] application."   20 C.F.R. § 416.912(b)(1).   "Complete medical history means the records of [the claimant's] medical source(s) covering at least the 12 months preceding the month in which [he] file[s] [his] application."   20 C.F.R. § 416.912(b)(ii).

However, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 416.912(a) ("[I]n general, you have to prove to us that you are . . . disabled.  You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled.").  And, while it is the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997). The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham*, 129 F.3d at 1423 (quotation marks omitted).

In this case, Harris alleged a disability onset date of August 9, 2019.  Doc. 10-4 at 29.  The record before the ALJ included medical records predating that onset

date by more than a year.  *See, e.g.*, Doc. 10-9 at 19, 46; Doc. 10-11; Doc. 10-12; Doc. 10-13; Doc. 10-14 at 2–29.   Thus, the ALJ exceeded the requirement of developing the record for at least one year prior to the alleged onset of Harris's disability.  *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(b).  Further, during the hearing before the ALJ, the ALJ asked if there was any outstanding evidence to obtain, and the only potentially relevant outstanding evidence identified was prison medical records predating 2017, which the ALJ and counsel agreed were not necessary based on the amount of time that had passed.  Doc. 10-3 at 39–40.

Nonetheless, Harris now argues that the ALJ should have obtained records related to his prior disability proceedings, the latest of which would have been from 2013, on the basis of Harris's testimony that his prior disability benefits were awarded based on "the bipolar stuff and irritable bowel syndrome" (Doc. 10-3 at 49), and based on the suggestion that "one would presume" from that testimony "that there is a finding in his earlier decision identifying IBS as a medically determinable impairment" (Doc. 17 at 9).  But the suggestion that medical information from a prior disability proceeding—approximately six years before the alleged onset of Harris's disability in this case—hypothetically could constitute objective medical evidence that Harris's IBS was a medically determinable impairment in this case is not enough to establish an "evidentiary gap" resulting in "unfairness or clear prejudice."  *See Graham*, 129 F.3d at 1423.  That is especially true because those

records were not identified to the ALJ as missing from the record evidence (Doc. 10-3 at 40), and because the claimant bears the burden to prove disability and to "produc[e] evidence in support of his claim." *Ellison*, 355 F.3d at 1276.  Thus, Harris has not made a showing of prejudice that his "due process has been violated to such a degree that the case must be remanded," on account of the ALJ's alleged failure to adequately develop the record.  *See Graham*, 129 F.3d at 1422–23.  As a result, substantial evidence supported the ALJ's finding that Harris's IBS was not a medically determinable impairment.

## IV.   The ALJ did not err such that remand is required in omitting bipolar disorder from Harris's list of severe impairments.

The ALJ did not err to the extent that remand is required in omitting bipolar disorder from the list of Harris's severe impairments.  In his briefing, Harris argues that his bipolar disorder is not resolved and qualifies as a severe impairment that impacts his ability to work and that should have been listed by the ALJ.  Doc. 14 at 26–28.

Here, at step two of the sequential process, the ALJ did not specifically include bipolar disorder in the list of Harris's severe impairments; rather, the ALJ found that Harris had severe impairments of anxiety, depression, lumbar degenerative disc disease with radiculopathy, and obesity.  Doc. 10-3 at 21. However, any error in excluding Harris's bipolar disorder from the list of impairments was harmless.  "Step two of the [sequential] test merely 'acts as a

filter'" because, if any severe impairment or combination of severe impairments is found, that is enough for the ALJ to "proceed with the rest of the five-step analysis." *Medina v. Social Sec. Admin.*, 636 F. App'x 490, 492 (11th Cir. 2016) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)).

In this case, the ALJ found that Harris had multiple severe impairments, then proceeded to the next steps in evaluating Harris's disability claim.  Doc. 10-3 at 21. Indeed, in analyzing whether Harris had a qualifying disability, the ALJ considered Harris's history of treatment for bipolar disorder (Doc. 10-3 at 24), and Harris's "own reports that his bipolar disorder [w]as well-controlled on his current medication regimen" (Doc. 10-3 at 28), as well as records from CED Mental Health Center that showed "substantial improvement in [Harris's] symptoms of bipolar disorder" (Doc. 10-3 at 28).

Further, substantial evidence supports the ALJ's ultimate finding that Harris did not have a qualifying disability, including bipolar disorder.  The record as a whole shows that Harris's bipolar disorder responded well to treatment, especially Depakote.  *See, e.g.*, Doc. 10-9 at 30, 53; Doc. 10-14 at 37, 45, 49, 54.  Harris testified at the hearing before the ALJ that medication took care of his problems related to depression, bipolar, and anxiety, except that he still got fidgety and hyper sometimes.  Doc. 10-3 at 46.  In light of the record evidence regarding Harris's condition, substantial evidence supports the ALJ's finding that Harris's bipolar

disorder was not disabling.  *See Crawford*, 363 F.3d at 1158.

Consequently, any failure to include bipolar disorder in the list of severe impairments at step two was harmless and does not require remand.  *See Medina*, 636 F. App'x at 492; *see also Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error standard in the Social Security context).

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **AFFIRMED**.  The court separately will enter final judgment.

**DONE** and **ORDERED** this September 13, 2023.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE